LOCAL 144, HOTEL, HOSPITAL, NURSING HOME & ALLIED SERVICES UNION, SEIU, AFL–CIO and New York State Nurses Association, Petitioners (93–4008(L) and 93–4014),

v.

NATIONAL LABOR RELATIONS BOARD, Respondent (93–4008(L) and 93–4014),

Juan Quiles, Leonard Washington and Iraida Cabrera, Intervenors (93–4008(L) and 93–4014).

NATIONAL LABOR RELATIONS BOARD, Petitioner (93–4044),

v.

The BROOKLYN HOSPITAL CENTER, Respondent (93–4044).

Nos. 212, 251 and 269, Dockets 93–4008(L), 93–4014 and 93–4044.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1993.

Decided Nov. 4, 1993.

James I. Wasserman, New York City (Vladeck, Waldman, Elias & Engelhard, P.C., of counsel), for petitioner Local 144, Hotel, Hosp., Nursing Home & Allied Services Union, SEIU, AFL–CIO.

Richard J. Silber, Albany, NY (Harder Silber and Bergan, of counsel), for petitioner New York State Nurses Ass'n.

William M. Bernstein, Office of Gen. Counsel, N.L.R.B., Washington, DC (Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Charles P. Donnelly, Jr., Office of Gen. Counsel, John Truesdale, Office of Executive Secretary; and David Cohen, Office of Director, Region 29, Brooklyn, NY), for respondent and petitioner N.L.R.B.

Richard A. Levy, New York City (Daniel J. Ratner and Elisabeth A. Werby, Martin Garfinkel, Eisner, Levy, Pollack & Ratner, of counsel), for intervenors.

Allan Weitzman, New York City (Proskauer, Rose, Goetz & Mendelsohn, of counsel), for respondent Brooklyn Hosp. Center.

Before: LUMBARD and OAKES, Senior Circuit Judges, and MAHONEY, Circuit Judge.

OAKES, Senior Circuit Judge:

The National Labor Relations Board ("Board") seeks enforcement of an order, *The Brooklyn Hosp. Ctr.*, 309 N.L.R.B. No. 174, Nos. 29–CA–13813, 29–CA–13842, 29–CA–13933, 1992 WL 442366, *1–*3 (N.L.R.B.) (the "Order") modifying the decision and recommendation of Steven Davis, *A.L.J.* (*reported in* 1992 WL 442366, *4–*48). Pertinent to this petition, the Order mandates the Brooklyn Hospital Center ("TBHC")[1] (1) to cease and desist from (a) encouraging membership in the Unions[2] as the "exclusive collective-bargaining representatives" of workers employed at the Caledonian Hospital ("CH"); (b) giving effect to the collective agreement between TBHC and the Unions with respect to TBHC employees located at the CH site; (c) deducting union dues from the pay of CH employees; (d) contributing to joint labor-management trust funds pursuant to the unlawful application of the collective agreements to CH employees; (e) permitting Local 144 and Local 3 access to CH premises; and (f) interfering with CH employees in the exercise of their right "to self-organization ... to bargain collectively through representatives of their own choosing" under 29 U.S.C. § 157 (1988); and (2) to take affirmative action to (a) withdraw and withhold recognition from the Unions as the exclusive bargaining representatives of the CH employees; (b) reimburse CH employees for any moneys deducted from their wages on behalf of the Unions; (c) provide alternative benefits coverage; (d) preserve and make available all records necessary to analyze payments due under this Order; and (e) post at the Brooklyn Hospital ("BH") and the CH sites notice of the substance of the Order. *See* Appendix to Order, "Notice to Em-

1. The Brooklyn Hospital Center is an acute care hospital comprised of two geographically separated divisions: the Brooklyn Hospital and the Caledonian Hospital.

2. The Unions involved are Local 144, Hotel Hospital, Nursing Home and Allied Services Union, Service Employees International Union, AFL–CIO ("Local 144"); New York State Nurses Association ("NYSNA"); Licensed Practical Nurses, Technicians and Health Care Workers of New York, Inc., Local 721, Service Employees International Union, AFL–CIO ("Local 721"); and Local Union No. 3, International Brotherhood of Electrical Workers, AFL–CIO ("Local 3") (collectively, the "Unions") (TBHC and Unions, collectively, the "Petitioners").

ployees," 309 N.L.R.B. No. 174, 1992 WL 442366, \*3–\*4. In addition, Juan Quiles, Leonard Washington and Iraida Cabrera (the "Intervenors") seek Rule 38 damages.

The Unions petition us to review and vacate the Order for the Board's abuse of discretion in disregarding the basic policies of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, and as contrary to relevant Second Circuit case law, *see NLRB v. Stevens Ford, Inc.*, 773 F.2d 468 (2d Cir.1985); *Long Island Jewish–Hillside Medical Ctr. v. NLRB*, 685 F.2d 29 (2d Cir.1982), and Board precedent, *West Jersey Health System*, 293 N.L.R.B. 749, 1989 WL 223929 (1989); *Manor Healthcare Corp.*, 285 N.L.R.B. 224, 1987 WL 89813 (1987). In the alternative, the Unions petition us to apply the residual unit doctrine.

We uphold the Board's Order in its entirety but deny the Intervenors' request for Rule 38 damages.

## I.

### Standard of Review

The Board has broad discretion to determine the appropriateness of bargaining units. *See South Prairie Constr. Co. v. Local 627, Int'l Union of Operating Engineers, AFL–CIO*, 425 U.S. 800, 805–06, 96 S.Ct. 1842, 1844–45, 48 L.Ed.2d 382 (1976) (per curiam). Although "the judgment of the Board is subject to judicial review ... its construction of the [NLRA] ... should not be rejected merely because the courts might prefer another view of the statute." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (citing *NLRB v. Local Union No. 3, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, AFL–CIO*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978)). On the other hand, the courts have the final say . in matters of statutory interpretation, *Ithaca College v. NLRB*, 623 F.2d 224, 228 (2d Cir.), *cert. denied sub nom. Ithaca College Faculty Ass'n, NYSUT–AFT v. NLRB*, 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980), and an administrative agency, like the National Labor Relations Board, is bound to follow the law of the Circuit. *See Reich v. Contractors*

*Welding of W. New York, Inc.*, 996 F.2d 1409, 1413 (2d Cir.1993) (citations omitted); *Ithaca College*, 623 F.2d at 228. Finally, the Board's factual findings "if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (1988); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (interpreting section 160(e)) (citations omitted).

## II.

### Background

Reading the decision of the A.L.J. as affirmed by the Board, *The Brooklyn Hosp. Ctr.*, 309 N.L.R.B. No. 174, 1992 WL 442366, \*4–\*48 (N.L.R.B.) ("Board Decision"), we find that the record substantially supports the following factual findings.

On October 1, 1982, the BH and the CH, physically separated by three miles, merged into TBHC. Prior to the merger, each hospital operated continuously and independently. After the merger, TBHC continued to operate two geographically separate divisions, BH and CH. TBHC took certain steps to integrate the two sites financially and operationally. For example, hospital resources were pooled and patients were readily transferred between the two sites. *See Board Decision* at \*8.

Nevertheless, BH and CH workers remained distinct. Employees at BH were unionized; those at CH were unorganized. Most important, up until late 1986, TBHC's intention was to maintain the historically unorganized status of workers at the CH site. *See Board Decision* at \*8–\*9. In fact, prior to November 14, 1988, TBHC had no written policy on employee transfers between BH and CH and job postings were available only at the particular site. Since 1987, only eleven employees have transferred between sites and another four or five transferred for one day. *Id.* at \*35–\*36. In short, between 1982 and 1986, management took extensive steps to integrate the operations of the two facilities, but followed a policy of accretion avoidance. *Id.* at \*11.

On October 14, 1986, the Joint Commission of the Accreditation of Healthcare Organiza-

tions ("JCAHO") issued a letter of tentative non-accreditation to TBHC ("JCAHO Letter") finding major deficiencies relating to the lack of operational integration between the two hospital sites. Many of the problems ultimately related to TBHC's lack of coordination between the two sites: inadequate evidence of a single medical staff, problems with housekeeping and sanitation techniques at CH, inadequate infection control committees (two uncoordinated medical staff committees performing this task), decentralization of the nursing department, two separate safety committees whose directors failed to coordinate efforts or to share information. *See* Letter from JCAHO to Frederick D. Alley, TBHC President, of 10/14/86.

TBHC responded that this dual corporate structure was maintained to accommodate the wishes of CH employees who wished to remain unorganized. *See* Letter from Alley to JCAHO of 10/30/86. In affirmative response to the JCAHO Letter, TBHC endeavored to standardize policies, procedures and job descriptions in an overall effort to integrate fully the two sites. TBHC instituted a corporate-wide quality assurance program to ensure uniform quality performance in both divisions. Consequently, by September 1988, there became "a great amount of functional integration between the [BH] and [CH] locations." *Board Decision* at \*40.

TBHC claims that it also read the JCAHO letter as requiring union integration. Thus, as part of its integration efforts, in October 1988, TBHC decided to accrete the smaller CH division employees into the existing BH bargaining units. The unions agreed to extend contractual coverage to the CH employees. *See* Letters from Local 721 to TBHC of 11/9/88; from TBHC to Local 144 of 11/10/88; from Local 144 to TBHC of 11/11/88; Local 721 to TBHC of 11/14/88; from TBHC to Local 3 of 11/14/88; and from TBHC to NYSNA of 11/15/88. *See also Board Decision* at \*9 (summarizing Alley's testimony that TBHC's "goals in avoiding accretion were to honor the right of the Caledonian employees to decide for themselves whether they wished to be represented by a labor organization"). However, a thorough reading of the Board's Decision leaves open the question of TBHC's motives for changing policies. Although some evidence supports TBHC's claim that it accreted the employees in response to the JCAHO Letter, *see, e.g.,* Testimony of Alley, other evidence supports the claim that TBHC accreted to avoid dealing with another union which had been trying to organize the CH employees. *See Board Decision* at \*10; Letter from Amy Gladstein, Esq., Local 1199 to John E. Truesdale, Esq., NLRB of 3/14/89 (stating Local 1199's belief that "the true reason for the precipitous accretion of the approximately 450 Caledonian workers has nothing to do with the alleged merger of the Hospital's operations. Rather it is attributable to the fact that the Hospitals became aware in the fall of 1988 that Local 1199 had begun a concentrated organizing drive, the goal of which was to be able to file representation petitions for all employees of Caledonian Hospital," and discussing Local 1199's representation petitions).

A number of CH employees filed unfair labor practice charges against TBHC challenging the legality of the accretion. The A.L.J. found that TBHC had violated 29 U.S.C. §§ 158(a)(1), (2), and (3) by (a) unlawfully recognizing the Unions, (b) applying the terms of their collective agreements to CH employees, and (c) permitting Local 144 and Local 3 access to CH business premises to engage in union activities during work hours. The A.L.J. did not order reimbursement of dues and initiation fees because the unions had not enforced the union security clauses. *See The Brooklyn Hosp. Ctr.,* decision of Davis, A.L.J., attached to *Board Decision* at \*46–\*47. The Board adopted the A.L.J. position, but ordered reimbursement of dues and fees as well. *See Board Decision* at \*1–\*3.

### III.

#### *Jurisdiction*

The Board had jurisdiction over the unfair labor practice charges under 29 U.S.C. § 160(a), (b) (1988). This Court has jurisdiction over the Board's petition for enforcement and the Unions' petitions for review under 29 U.S.C. § 160(e) and § 160(f) (1988), respectively.

## IV.

### Discussion

#### A. General Principles

■ Under the NLRA, a union must be "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a) (1988) (NLRA § 9(a)). An employer who recognizes a union which lacks majority support ("minority union") is in violation of 29 U.S.C. § 158(a)(2) (1988). *See ILGWU, AFL–CIO v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The policy behind this rule lies in the importance of employee self-determination.

#### B. The Accretion Doctrine

■ Accretion is an exception to this policy. Pursuant to the accretion doctrine, an employer may incorporate a small group of employees to an already existing collective bargaining unit, without holding elections, so long as the added employees (1) do not constitute a separate bargaining unit and (2) do not outnumber the employees who belong to the existing bargaining unit. *See NLRB v. Stevens Ford, Inc.*, 773 F.2d 468, 473 (2d Cir.1985); *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1030 (2d Cir.1980). Accretion promotes the policy of industrial stability. However, accretion can preclude self-determination and therefore should be narrowly applied to situations where the smaller group has lost its separate, independent identity. *Stevens Ford*, 773 F.2d at 473. Thus, for example, where the two groups of employees can be classified appropriately into separate, viable bargaining units, accretion is not permissible. *Id.*

■ Factors to consider in determining whether employees should be accreted into an existing bargaining unit without an election include (1) the usual factors concerning bargaining unit determinations of several employee groups (i.e., geographic proximity, similarity of skills and functions, similarity of conditions of employment, centralization of the employer's administration, managerial and supervisory control, interchange between the employees, functional integration of the employer, and bargaining history), *Stevens Ford*, 773 F.2d at 473; (2) size of the group to be accreted relative to the size of the existing unit, *id.*; (3) whether the group to be accreted was in existence at the time the existing bargaining unit was recognized, *id.* at 474; (4) whether the existing group is the result of prior accretions, *id.*; (5) views of the employees to be accreted, *id.*; and (6) an independent determination "whether the group of employees to be accreted constitutes an appropriate unit." *Id.* at 473. If the group to be accreted does not constitute its own appropriate unit, then the employees should be accreted so long as accretion does not cast into doubt the majority status of the bargaining representative. *Id.* Where the group does constitute a separate bargaining unit, the employees of that unit have a right to choose whether or not they wish to elect a different bargaining representative or no representative. "A 'balancing' of the elements bearing on a finding of accretion must be made because, in the same case, some elements favor such a finding, and others do not." *Board Decision* at *38 (citing *Gould, Inc.*, 263 N.L.R.B. 442, 446, 1982 WL 23866 (1982)).

#### C. TBHC's Unfair Labor Practice by Accreting the CH Employees into the Existing BH Bargaining Units

Although the accretion doctrine is narrowly applied, the Circuit had been inclined to favor nonproliferation of bargaining units in nonaccretion contexts in the healthcare industry. *See Long Island Jewish–Hillside Medical Ctr. v. NLRB*, 685 F.2d 29, 34 (2d Cir.1982) (NLRB's "single-facility presumption is inapplicable in the health care context"); *see also West Jersey Health Sys.*, 293 N.L.R.B. 749, 751, 1989 WL 223929 (1989) (holding that the single-facility presumption is applicable but the presumption can be rebutted "where a labor disruption at one division ... would adversely affect the health care available at other divisions").

Given our previous and the Board's own precedents, TBHC and the Unions argue that the Board neglects (1) the Second Circuit warning that the single facility presumption should not apply in multi-site healthcare

facilities, *Long Island Jewish–Hillside Medical Ctr.*, 685 F.2d at 34, and (2) its own guidelines that the extent to which industrial action at one site would cause work stoppage at another site is evidence that the sites constitute an appropriate single bargaining unit. *See West Jersey Health Sys.*, 293 N.L.R.B. at 750–51 (citing *Manor Healthcare*, 285 N.L.R.B. 224). The Petitioners argue further that when Congress extended NLRA coverage to all private health care institutions, it expressed concern that "the proliferation of bargaining units in the health care industry might lead to disruptions in patient care." *Long Island Jewish–Hillside Medical Ctr.*, 685 F.2d at 33 (citing T. Merritt Bumpass, Jr., *Appropriate Bargaining Units in Health Care Institutions: An Analysis of Congressional Intent and its Implementation by the National Labor Relations Board*, 20 B.C.L.Rev. 867, 871–74 (1979); Lawrence F. Feheley, *Amendments to the National Labor Relations Act: Healthcare Institutions*, 36 Ohio St.L.J. 235, 287–89 (1975)). The Petitioners conclude that the Board's decision disregards the law of this Circuit and should be vacated. *See Reich*, 996 F.2d at 1413 (administrative agencies are bound by the law of this Circuit); *Ithaca College*, 623 F.2d at 228 (same).

However, the Board does not arbitrarily disregard the teachings of *Long Island Jewish* or *West Jersey Health System*. A careful reading of the A.L.J.'s opinion as affirmed by the Board indicates that the Board did not apply the single-facility presumption but properly applied the more restrictive accretion standard, with the careful balancing of all of the elements (favoring and disfavoring accretion) including the fact that between 1982 and 1988, the critical dates, TBHC properly tried to avoid accretion by keeping employee operations at the two facilities quite separate.

Specifically, the Board determined that three factors opposed accretion in this case: (1) the deliberate historical exclusion of the CH employees from the BH bargaining units, *see Board Decision* at *40; *see, e.g., Stevens Ford*, 773 F.2d at 474 ("[i]f the group was in existence and excluded from an election, then accretion should not

normally be permitted") (citations omitted); (2) the views of the CH employees who initiated this complaint, *id.;* and (3) the lack of interchange between the employees. *See Board Decision* at *35–*36 (only eleven employee transfers since 1987). Moreover, the evidence suggests that the CH licensed practical nurses ("lpns") outnumbered their BH counterparts. *See* Direct examination of Lynn Ende, State Field Representative of Local 721; Redirect examination of Alley. Consequently, at least with respect to the lpns, the accretion doctrine could not possibly be applied. *See Stevens Ford*, 773 F.2d at 473–74.

Other factors, however, favored accretion: in particular, the functional and operational integration of the two sites as well as their relatively close geographic proximity. *Board Decision* at *40. However, the Board concluded that *on balance* factors favoring non-accretion outweighed factors favoring accretion. *See Id.* at *40 ("I do not believe that the record factors favoring accretion are sufficient to overcome the factors disfavoring accretion. When viewed with respect to the operation of the hospital as it affects the Caledonian employees, it is clear that the Caledonian employees possess a separate identity from that of the Brooklyn Hospital employees."). In striking this balance, the Board was sensitive to the "long-held policy that a finding of accretion, imposing a union upon employees that they have not selected, and foreclosing such employees from their right to choose a labor organization of their own choosing, is restrictively applied." *Board Decision* at *41. Given the broad discretion afforded the Board in determining the appropriateness of bargaining units, we cannot say that the Board was arbitrary and capricious in its balancing analysis.

Moreover, *Long Island Jewish* has been undercut by the unanimous opinion of the Supreme Court in *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991), where Justice Stevens' opinion reads the congressional committee reports not as containing an authoritative statement of congressional intent but merely as an admonition to the Board to give due consideration to the special problems that

proliferation might create. *See St. Margaret Memorial Hosp. v. NLRB,* 991 F.2d 1146, 1155 (3rd Cir.1993) (reading *American Hospital* as undercutting the Third Circuit's own previous precedents).

Given that our precedent has been brought into question by the reasoning of Justice Stevens' opinion in *American Hospital,* we cannot say that the Board was bound to follow this Circuit's preference for consolidating bargaining units in multi-site hospital situations.

In summary, the Board did not abuse its discretion in failing to apply the accretion doctrine.

**D. TBHC's Unfair Labor Practice by Permitting Access of CH Premises to Local 144 and Local 3**

■ The Board also found that TBHC engaged in unfair labor practices in violation of 29 U.S.C. §§ 158(a)(1), (2) (1988) by recognizing the Unions as the exclusive bargaining representatives of the CH employees without their elected support, and then permitting access to Local 144 and Local 3 to CH premises during business hours. *See Board Decision* at *45. Having found that accretion was not appropriate in this case, the A.L.J. concluded that TBHC's acts of accreting the CH employees and then permitting Local 144 and Local 3 (unelected unions with respect to the CH employees) to use CH premises during business hours (1) interfered with CH employees in the exercise of their NLRA Section 7 right "to self-organization . . . to bargain collectively through representatives of their own choosing" and (2) violated the NLRA's prohibition against an employer who "dominate[s] or interfere[s] with the formation or administration of any labor organization or contribute[s] financial or other support to it." 29 U.S.C. §§ 158(a)(1), (2) (1988).

We find nothing in the record to contradict the Board's findings with respect to these charges.

**E. The Residual Unit Doctrine**

■ The Petitioners also ask us to apply the residual unit doctrine in the event we uphold the Board's decision not to apply the accretion doctrine. The residual unit doctrine is invoked where (1) the majority of employees in a plant, department or otherwise appropriate unit, are already represented by one union, *NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 681 (2d Cir.1971); and (2) another union attempts to organize the remaining unorganized employees who have been historically excluded from the existing bargaining units. *Id.* If the Board determines (1) that a group of employees is residual, *and* (2) that either an overall bargaining unit or separate bargaining units would be appropriate, then the Board may order a self-determination election. *Id.* (citing *Pennsalt Chems. Corp.,* 119 N.L.R.B. 128, 129 (1957)); *Sealtest, Ohio Div. of Nat'l Dairy Prods. Corp.,* 117 N.L.R.B. 1628, 1629–30 (1957). The purpose of the election is to permit the employees to express their desires as whether to be represented in a separate unit, to be included in an existing unit, or to remain unorganized. *Rostone Corp.,* 196 N.L.R.B. 467, 467–68, 1972 WL 12480 (1972).

In determining that accretion did not apply in this case, the Board was silent on the question of the appropriateness of bargaining units. The A.L.J. found that "it is clear that the Caledonian employees possess a separate identity from that of the Brooklyn Hospital employees." *Board Decision* at *40. From this we cannot deduce whether one or two bargaining units is appropriate in any of the categories of workers before us. We can only infer that CH employees and BH employees do not possess such a common identity as to merit a finding of accretion that would circumvent the rights of the CH employees to self-determination. The Board may resolve this question in a representation proceeding. However, we will not review this question before the Board has had a chance to resolve it.

**V.**

*Board's Reimbursement of Dues and Fees*

■ The Board, unlike the A.L.J., ordered reimbursement of dues and fees. We perceive no abuse of discretion.

## VI.

### *Fed.R.App.P. 38 Sanctions*

The Intervenors ask us to award damages under Fed.R.App.P. 38 because the Petitioners' claims are frivolous. We find insufficient cause to award damages in this case.

### Conclusion

Accordingly, we find that the Board did not abuse its discretion in making its factual findings and did not disregard the law of this Circuit, as modified by the Supreme Court. We uphold the Board's findings that TBHC engaged in unfair labor practices by accreting the CH employees into the existing BH bargaining units and by permitting Local 144 and Local 3 access to CH premises. We also uphold the Board's unwillingness to order a self-determination election as a remedy. We therefore deny TBHC's and the Union's petition to vacate the Order and grant the Board's petition to enforce the Order.